How do we pronounce the plaintiff's name? Zahumensky. Zahumensky, good job Mary Ann. Alright, before we start you guys can sit down, this is in my view at least, in our view three separate appeals in essence and we've set aside an hour for it. And so our thought was to do one, each defendant separately, let the plaintiff who is appellant in all three cases address the claims against that appellee and then move on to the next one. Is that acceptable to you guys? I'm sorry, were you talking about the plaintiff will speak and then that defendant will speak? Yes, and then you can respond briefly because they're really three separate orders that I think have very little overlap in the issues. Okay, so basically to set 15 minutes, I'm sorry 20 minutes for each of the three appeals giving the appellees 10 and you 10 but you can save a couple of those 10 for rebuttal. We're loose, I mean some may take longer than the other whatever. I will totally lose track of that time. Yes, and I will try to keep track of that time. Do you, I guess you're the plaintiff's counsel, do you have a view of the order in which those three should be considered? Thank you, Your Honor. I have intended to take them in the order, please, and that also makes sense to me because that's the order of the commercial transaction of the Sox, Bennett, and Inseka. Okay, so Sox, Bennett, and Inseka, is that fine with you guys? Yes. All right, all right. And as you probably know, this microphone does not amplify or only record, so keep your voices up nice and loud. All right, so we will begin with the plaintiff's appellants vis-a-vis White Sox. May it please the court, counsel? My name is Mike Reagan, and together with Dave Wise, who is seated at the counsel table, we represent the plaintiffs, Thomas and Kathy Zahominski. There is a factual interplay between and among the defendants here. This is not a typical he said, she said situation, but rather each defendant is saying what the other should have said but didn't. It's sort of more like what he should have said and what she should have said. The Sox say that they are just baseball owners, that the Sox hired Bennett for its expertise in judgment about safety recommendations, that Bennett knew that workers used the roof to access the plainly visible equipment, and that Bennett should have told the Sox of the availability and need for walkways. Counsel for the Sox wrote below that that's precisely the kind of expertise that you look for in that kind of roofer. Bennett says that it expected the Sox to know and say what it wanted. However, it is imperative to remember that Bennett's Steve Niggins, who was the project manager on this job, testified that a Bennett settlement must have an intelligent conversation with the customer about the expected uses for the roof so that Bennett could give advice. That didn't happen here. Sika says it can't be expected to advise every purchaser of every roof of every product, but we don't say that it must. Rather, the law requires that Sika warrant its intermediate vendee, who in this case is Bennett. Sika says Bennett should have told the Sox about the walkways. Bennett's Ehart, the salesman here, in turn says that if Sika had told Bennett to tell customers that slip-resistant walkways should be installed on low slope roofs like this, he would have done that. Plaintiff's expert, Casey Orr, offers uncontradicted opinions that each of those unfulfilled expectations and obligations of the Sox and Bennett are exactly what should have happened here. Because his testimony is uncontradicted, then the case law requires that those opinions be taken as true for purposes of this summary judgment. However, and this gets to the point which Justice Mikla has talked about here, the nature of each defendant's legal liability stands or falls on its own. There is no single legal principle, nor any single fact, which would result in a common affirmance of these separate orders of summary judgment. The defendants may attempt to sort out their relative responsibilities through the law of contribution, and the White Sox has already done a very competent and eloquent job of doing that. But for now, I respectfully state that none of the summary judgments should have been granted. It is possible that this Court recognized the situation that these were separate cases in allocating the time, and then when we get here today and see that you've split it like this, then it's pretty clearly the case. As for the White Sox, then, there are two sources of duty which the Sox owed to Thomas. First, he was a business invitee, and secondly, they owed him, as their contractor, a safe place to work. Now, both of those duties are non-valuable, and they include the need to provide a reasonably safe means of ingress and egress, which under these facts would be for ingress and egress to the scoreboard across the roof. The Sox don't dispute that they owe those duties, but they contend that they do actually. Pardon me? They do. They claim that there was no duty because they had no notice of a dangerous condition. As I was saying earlier, that's correct. They don't dispute the basis of the potential duty, but then what they do write, they don't address the safe place to work especially, but they do say that Section 343 of the Restatement, which is the general rule regarding premises of liability, et cetera, becomes superseded in this case because of the natural accumulation rule, and I accuse them in the brief wrongly. I very much apologize. That's actually a different issue. Pardon me? That's a different issue. The accumulation is different from what I just raised. That's it. I'm just raising what the Sox raised. Yes. Well, yeah, but you're co-mingling them as if they're one and the same. I'm coming in what way? Well, they're the Sox. One of the things you just said to the Sox had a duty is that they don't dispute that. Right. And they actually do in their brief at least. Okay. I'll accept that. I'll accept the promise of your question that they say we don't have any liability, and therefore they're the same. Well, they don't have a duty. Liability is something different. Don't co-mingle them. They're saying they don't even have a duty because they had no notice of a dangerous condition. Right. And they also say that this was a natural accumulation. So let's go straight to that then. This PVC was white. There is abundant testimony in the case. And here, of course, we don't need an abundance of testimony on summary judgment. We just need some. But there is an abundance of testimony that the roof, because it's uneven, unsurprisingly, can churn and collect water and other things over a period of time. It hadn't rained that day. I don't believe there's any evidence in the record as to when it had last rained, but I'm not quite sure about that. But certainly the plaintiff said it had rained that day and it hadn't rained at his home the day before. And so the plaintiff testified, his co-worker testified, and even Bennett's Steve Wiggins testified that he said that these small areas can catch a person by surprise. And they are described with the water on the roof results in conditions which is extremely slippery. Somebody said it's like algae. Somebody else said it's like oil and very slippery. So the plaintiff has two experts, Ken Zior and Johnson. Ken Zior was the guy that did the technical testing about slippage, et cetera, and Ken Zior is the expert on requirements. And they offered highly specific expert testimony on that, that the roof became unreasonably slippery. And what is it that you say the White Sox should have done, since your experts thought Sarnatrad was a big waste of money and time, I believe, that Sarnatrad would not have fixed the issue? Right. Sarnatrad wouldn't because it's just as slippery as anything else. But CrossGrip, which is a second product that was also a serious issue. And is there evidence in the record that CrossGrip was available at the time of this case? Yes, yes. The first piece of evidence on that is that EHART just didn't know about it. But the Niggins, who was also with the company, said, yes, it was available and it was there. It was always available. It just wasn't offered. And so that's what the Sox should have done in response to your question, is to put down this CrossGrip, which is sold by Sika, to be slip resistant. And so the product data sheet for CrossGrip says that it prevents unnecessary accidents. It can be used even near water ponds, which is what it says in its description. And it says that it is slip resistant. So following up, Justice Walker, on your question, we have set out the violative case law in response to the Sox here. And I'll mess up the pronunciation, semes, semes, which was the appellate court opinion in the Supreme Court firm, and pointed to the appellate court opinion and said that it was well set out. And we like to hear that in the appellate court, and we agree with this law. But when you have an excessively and unusually slippery surface, then the normal rule about natural accumulation doesn't apply. And so then we cite the appellate opinion in Fanning v. LeMay. Fanning went to the Supreme Court, but on a different issue. And then a Seventh Circuit opinion, and then also a United States District Court opinion as well. So that's the answer to the – that's our primary answer to the Sox, is that because of the unusual nature of this material, that the natural accumulation rule doesn't apply. And if you want to save time for the Sox, you need to wrap up the Sox right now. Let them talk and come back. Yes. And I would say that, you know, as I was thinking about this, that the Sox had covered the roof in mirrors, extraordinarily slippery. Yes. And – but then said, well, wait a minute. We invoke the natural accumulation rule here because, you know, you'll fall out. It's essentially what was done here. So there are questions of fact as when was this unreasonably slippery. Should they have known that? Should they have installed slip-resistant walkways? And they can talk about this comparative negligence, but that doesn't go to duty. Summary judgment. That's the only thing we're going to talk about is summary judgment. And actually, just to address that briefly, and that doesn't seem to have been briefed very much, what could he have done? I mean, right? He couldn't put cross-grip on the roof. Yes. Yes. But anyway. But the contract, it is as an add-on Cernit tread, but it didn't have the other one. I forget the name of it. Right. And so how would the White Sox know that they should have put the other one on? And they did not know. And I would expect the Sox, certainly in support of their contribution plans, et cetera. I mean, we set out in our brief how they eloquently, truly said, we expected advice, judgment, and design recommendations from Bennett, and we didn't get it. And so the Sox themselves did not know. And Nittings, who is the a-primary guy for Bennett, says that a roofer like this ought to have what he called an intelligent conversation with the customer about what are the needs of the roof, what are the little possibilities, what are the products we can offer, and things like that. And that didn't happen. As I depart and pick up my book, it feels like Prime Minister's Question Hour. Well, but just what would the Sox do if they didn't know this? And it wasn't the additional $18 per lineal foot your expert says would work. So I'm just not sure. Well, the Sox had, I think I perhaps know what's informing your question here. If I don't, tell me. The Sox had a duty. They had somebody there to work. They had a duty to provide a safe place to work. And the slipperness is something that they should have known and were required to know, and they created it. I mean, this wasn't a question. I mean, it's their roof. They had it put on. They got good advice from Bennett was another question. But nonetheless, they created the condition. They also had engineers on staff. Pardon me? They also had engineers on staff during the project, correct? Bennett? Or the Sox. The Sox had, I'll have to leave that to direction. I don't know the answer to your question, Your Honor. Going to Justice Griffin's question, is your point that the Sox, whether they knew about cross-strip or not, had an obligation to inquire as to what could be done to make this roof safe? Precisely. They knew that, I mean, this was. That it wasn't safe and that they needed to do something about it. Exactly. And the equipment was there. The scoreboard was there. The scoreboard was used in every game. And they had that worked on them for every game. They knew what had to happen. Okay. Bennett? Bad luck. Good afternoon, Your Honors. May it please the Court. My name is Gretchen Sperry, and I'm counsel for Eppley v. White, Chicago White Sox. With all due respect to my friend, Mr. Reagan, at its core, the claims against the White Sox are nothing more than traditional slip-and-fall claims. And the Circuit Court granted summary judgment on two bases, as Justice Walker pointed out, that we raised. Number one being no constructive notice of a dangerous condition on the property. And number two, that, of course, whatever water there may have been, assuming that taking plaintiff's testimony as true, that whatever water was there accumulated naturally. Those are both questions, ultimately, of duty, of whether the White Sox had any duty to warn, to protect, or prevent against any injury that would have occurred. But both of those, I think, and tell me if I'm wrong, assume that the dangerous condition is the water, where, in fact, I think the plaintiff's allegation and argument now, at least, is the dangerous condition is this PVC that makes up this roof. So you're going directly to that point, Your Honor. And I will skip over and I'll rest on the briefs on the two positions, the notice and the natural accumulation claims, and devote my time to respond to that. So the issue that counsel raised in his appellant's brief was that both of these two legal propositions apply, that there's an exception, under this Sinise case, that says that the property owner may be liable in certain situations where the surface itself becomes unreasonably slippery or dangerous. Now, in order to invoke that exception, plaintiff would have to provide some evidence, number one, that the material that was used, the PVC material itself, became very slippery and dangerous when wet. And also, that there was a duty. It was made by everybody. Right, exactly. So we're past that. Exactly. And then the second part of it, and then also that the non-skid walking was required. And the second part of that, though, is that plaintiff would have to provide some evidence that the White Sox knew about the PVC, about the slipperiness of it, and that non-skid walking was required. So with that, I'll turn to the first point, which is that as to whether the PVC material itself was unreasonably slippery, plaintiff's own experts, one of plaintiff's own experts, Brent Johnson, conducted a coefficiency of friction analysis on this very roof at guaranteed rate field. And the purpose of that study was to determine how slippery this particular roof was where the incident occurred when wet. And the results of that report showed that this particular surface that Mr. Zieminski slipped on fell within the range of moderate to high traction, and that that result was acceptable. And plaintiff's other expert, Mr. Kensier, in reviewing this traction report testified, actually, that a moderate traction surface, quote, isn't bad, calling into question whether this was unreasonably dangerous. Additionally- But calling into question, ah, there is your problem. This was summary judgment. I'm not saying they proved it was unreasonably dangerous, but there was certainly some evidence that it was unreasonably dangerous. Fair enough, Your Honor. But to continue on, and understanding that there is no evidence, however, that there was any requirement that the cross grip, the non-skid walkway surface, the cross tread, was required to be installed on this roof surface. There's not a single regulation, rule, statute, ordinance, code, policy, or procedure that requires that this type of surface be installed on this rooftop. Now, there were citations to ANSI standards and OSHA standards, none of which create a common law duty to have placed this non-skid walkway on this roof surface. Above all of this, there is no evidence in the record that the White Sox knew any of this information. And I think the plaintiff knows very well of this, and I say that respectfully because this was the main thrust of the plaintiff's argument in response to Bennett's motion for summary judgment below. That the responsibility fell to Bennett to ask the questions to determine what the uses would be for this property. That Bennett's own representatives, Mr. Niggins and Mr. Ehart, admitted that as the contractor, they had the obligation to ask the property owner what the uses were so that they could provide the proper products to the ultimate end user. It was the salesman's responsibility. In this case, Mr. Ehart was the salesman, who was also the vice president of Bennett, and he didn't even know about the existence of the cross tread, which is the non-skid walkway. How could this White Sox have known about the existence of the non-skid walkway or whether it was required in this situation if the vice president of Bennett, the roofing contractor, the elite contractor for Sika Products, himself didn't even know about the existence of this product. So there is no evidence on the second prong of this semis exception. So plaintiff is unable to invoke the exception. With that said, there are no other arguments on appeal calling into question additional facts that suggest that the White Sox had constructive notice of the dangerous condition, meaning the water on the roof, and nor were there any other suggestions on appeal by counsel that this was anything other than a natural accumulation of water. Is there any law that suggests that there has to be some regulation or some other legal requirement for there to be a duty? No. Right? Well, so in order for there to be what's called an unnecessarily dangerous condition in the type of case like Semis and others that followed it, there would have to be some kind of expert testimony to suggest whether there was a standard or something that would have imposed that duty on the contractor or on the end user to have to put this non-skid walkway on. And there was none of that here. And plaintiff's expert testified to that. And there were, I think there's evidence in the record that there were alternatives other than the non-skid walkway that could have ameliorated the slipperiness of the... No. As a matter of fact, Your Honor, the CrossGrip is the only product that has been cited as the non-skid walkway. That's been plaintiff's theory, that that is the product that needed to be installed. Now, SICA has put out their roofing... Well, stones would affect either. Sure. But it does not require that a non-skid walkway be installed on this PVC roofing. It says that if it's a high-traffic area, a walkway must be installed. But as everyone agrees, the primary purpose of any walkway is for protection of the roof surface and not for the protection of the workers or anyone who may be on that roof. So in SICA's installation manual, even though it says a walkway must be installed in high-traffic areas, it includes reference to the CrossGrip, but it also includes reference to the Sonitred, which, as Justice Mikva pointed out, Mr. Kensier called, you know, basically useless and as slippery or more slippery than the roof surface itself. What about the failure to drain properly? There's no evidence in this case that there was any issue with the drainage on the roof. The place where Mr. Zajiminski fell was far away from any of the roof drains. Mr. Kensier testified that there was no evidence in this case, and there isn't any otherwise, that there was a problem with drainage on the roof. This is simply a bigger problem. But the fact that the water accumulated and there hadn't been any rain in a couple of days, that's what I mean that it didn't. So there is testimony that, well, Mr. Zajiminski, in his deposition, says, quote, unquote, that he assumed that there was a depression in the roof where the water had accumulated. Even if that were true, Mr. Kensier testified that those kinds of depressions on a roof like this are common, expected, they're normal, and in no way does that create a deviation from a standard that would make this an unnatural accumulation. There's other case law, Gilbert v. Toys R Us, for example, from this court, and in a similar situation where there were depressions in a parking lot where ice had accumulated. And in that type of situation where the depression itself is not deemed to be a deviation from any type of standard and hasn't been augmented or enhanced in any way. Was that a summary judgment case? Sorry? Was that a summary judgment case? That was a summary judgment case. But in those types of situations, that is not deemed an unnatural accumulation. Unless there's more questions, we should let Mr. Reagan see what else he wants to say about the White Sox. Great. Thank you. Thank you. I'll be very brief. In response to Justice McVeigh's comment that you don't need a standard, a law, which is legally applicable in order for these standards to come into play. So at page 8 and 9 of our brief, of our main brief, we set out the expert testimony in which Johnson and McKenzie talked about the ANSI standard, the ASTM standard, and OSHA. And all of those come in not as a matter of law creating duty, but rather as evidence of negligence. And that is a commonplace occurrence down the street. As to what the White Sox knew or should have known, it's a commercial operation where they invite people in to do this work. They have a duty of ordinary care. And that assumes and includes the fact that they have to know the conditions of its property and to be reasonably aware of its condition. Now, if they wish to defend saying, well, there's no way we should have known that this was slippery, well, then that's a question of fact for the jury. But it's not a matter of summary judgment. And that applies also to the extra slipperiness of it as well. That's something that was noted by them. As to the cross-grip, we're not talking rocket science here. I mean, the shot gets unrolled and laid down, and I think it can even stay there just in that condition, but you can also roll it down with using other material. I think our expert testimony disputes a tremendous amount of what you just said. I'll leave it at that. Thank you. All right. So do you want to move on to Bennett? I'd be pleased to. Just before I do that, it just seems to me that we're conflating the duty of ordinary care with the duty to warn regarding dangerous conditions. It seems like we're just lumping those all together, whereas I think they're different. Well, they sort of run together in a way. I mean, so if you've got a dangerous condition, I mean, maybe you start off worrying about it. Everyone sees signs, slippery, long, wet. That's a start. Another option is to put down what the expert says shouldn't be put down, which was the cross-grip. Or it can come from other suppliers as well. I mean, this is just a common product, and it should have been there. And if we were hired looking down on somebody's roofs, you'd see it. So it could be a warning. It could be ameliorate the condition. It could be a number of things. Yes, that's where your question of fact is coming from. Yes. Not the subject. No, this is a question of fact. Exactly. Okay. Exactly. As to bank, we'll say. The source of the duty there, there's no doubt about it. It's been in existence in Illinois. The restatement as Section 3 and 5 has been recognized since at least 1978 in Illinois. It's a commonplace. One who, on behalf of the possessor of the land, creates a dangerous erectus structure or creates any other condition which has the capability of causing physical harm is liable for the dangerous character of that structure or condition, even after his work has been accepted by the possessor. And the late Justice Joseph Gordon in Madden v. Passion explained that this principle of law is necessary so that contractors who do work are not insulated from the consequences of their faulty work and that this is a proper aspect of public policy. When that moved for summary judgment, it basically made a pretty argument saying it had, quote, no special relationship with the planet. Well, this section says you don't need one. It also said that it did propose walkways, but the evidence here is that if it, but it gave a pricing for the Sinotrad, which was just more slippery stuff, and there is not a shred of evidence in the record that Sinotrad or any other, excuse me, that CrossCorp or any other slippery system walkway was offered. It's important, I think, to notice that this was a, what Niggins described, Niggins from Bennett describes, it was not a big job. They weren't giving a set of plans and stats and saying give us a price. It was what he called a negotiated job, where he sat down with Mr. Esposito from the White Sox and they began to talk about, you know, what's needed here. And they went back and forth. Now, the conversation didn't proceed as it should, but that's what happened here. And then Ehart then drew up the proposal and brought it back to the Sox. He had no idea what Esposito knew or didn't know about roofs because he never asked him. And as I said earlier, Niggins testified, from Bennett testified that there should have been this intelligent conversation to go through that. Bennett's argument that the Sox were limited in what the Sox and Bennett could do because the sports facility authority would only tolerate replacing what was there before doesn't even get out of the gate. There's no evidence that Bennett or the Sox ever asked the sports facility authority for permission to do something safer. And in fact, later, the sports facility did approve. Yes, yes. And we've offered a citation to the court that that's admissible in this case. I'll leave that alone. The trial judge, as the trial judge has certainly intended to do, injected his own thoughts as to what law might apply here separate from the Bennett motion. And he first offered Hunt v. Blasius, which is the well-known rule that contractors are not liable for filing claims unless a contractor of ordinary prudence would recognize that it was creating a danger. The bid job versus the negotiated job. Yes. Because then it's a bid job. Yes, exactly. And so there's the exception to that rule that if a person of ordinary prudence should have realized it was a danger, then you don't file the claims. Now, keep in mind, of course, I can't tell you what to keep in mind. I'll keep in mind. I'll keep in mind that. Why don't you just tell us what we should keep in mind? Yeah. It was the benefit of the plans itself. So then at the next hearing, this went on sequentially for day after day down there. Before you go on, I just want to pause you for a minute because you seem to suggest that it's inappropriate for the trial judge to be knowledgeable of case law. No, I didn't. I said. In your brief, you seem to suggest that it was inappropriate for the trial judge to be knowledgeable of case law outside of the law presented by the process. If I gave that impression, I surely didn't mean to. I always enjoyed hearing the fellow small trial judges who, you know, all I was saying was that it was different than the argument that was made by Bennett. And as I said here today, there's nothing wrong with the judge doing that. So the judge then turned to Thompson v. Gordon, which is a relatively recent Supreme Court case. A case which was not cited by the parties. Which was what? Which was not cited by the parties. Correct. Okay. But then fully discussed. And there, there was a professional engineer who was trying to design something. He did, and the Supreme Court had that he didn't have an obligation to design something else. Here, however, Bennett worked with the right sides and talked about what we should do. And it's, you know, Bennett wasn't told what to do. They decided as to what they were going to do, which is the essence of our case is to them. So there are important questions of fact which require reversal of the summary judgment in favor of Bennett. Did Bennett erect a structure or condition which was sufficiently dangerous to pose a risk of physical harm, in the words of Section 385? But they followed the contract. They did exactly what the right sides wanted them to do. That's their argument. That's their argument. But it should not be accepted with respect because they wrote the proposal. They sat down and the evidence, the right sides said that they expected, they hired Bennett, they hired this kind of big roofer, big batman, to give them judgment and expertise. And their complaint and their contribution claim is that they didn't get it. And our expert says that they should have gotten that kind of advice, and Millens, who is the project manager here, said there should have been an intelligent conversation back and forth. So if they followed a contract, they followed a contract which they wrote, a proposal they wrote in which was inadequate. In light of what we're doing here, I'll stop at that point unless there's further questions. Bennett. Thank you. Good afternoon. May it please the Court, Counsel. My name is Richard Terriello. I represent Bennett and Brousseau Roofing in this matter. As the Court has already identified, there are a lot of interesting issues in this case, and it's almost like three cases in one. As you've identified, the issue with my client is whether or not it recommended walkways, and if it didn't, whether it should have, and also whether it should have installed the walkways even without permission from the owner of the stadium. Oh, I don't think they're arguing that. And we don't have to get that far, I guess. That's not what I'm saying. Stop with the walkways. No walkways. As the Court has identified, the trial court raised Thompson and Hunt during the briefing in this matter. Subsequent briefing was had and arguments were held, and that's what it comes down to. The defendants, my client, feels that Thompson and Hunt control, and the plaintiff has cited to Lundy and Madden in support of their position. The facts in this case, I believe, are similar to Thompson. As you well are aware, Thompson, the engineer was, the defendant was retained to replace the median barrier. Unfortunately, an accident occurs, and then the plaintiff alleged that they should have recognized that median barrier wasn't sufficient, installed a jersey barrier. The Supreme Court looked, and they basically looked at the contract, and that's where all these cases seem to come down to. And as the Court has pointed out, the contract defines the duties of the parties. Yeah, but in this case, the contract is preceded by a bunch of negotiations back and forth. By the time the contract's entered into, yes, that defines defendant's duties. But what about everything that happened before that contract? And what about particularly the testimony that counsel relies on, that it was a negotiated bid? It wasn't, you know, that it was negotiated work rather than bid work. Well, I believe a bid was solicited and submitted, and then discussions were had because, as Justice Walker pointed out, the White Sox had an engineer that was involved in this process, and Mr. Sampe from the ISFA testified that engineer was involved in every aspect of the stadium. He, I think he even testified they would turn every doorknob and turn on every TV, and they even inspected the roof to see what was needed. And this roof was approaching, I believe, 20 years, so the warranty was about to run out. So they had people on their side reviewing items, and Mr. Sampe even testified that he would look to those engineers for guidance on walkways. He didn't say he would look to Bennett. I believe his testimony was that he would look to the engineers involved for input on those walkways. So to get back to your point, I apologize. It's okay. I believe this is similar to many construction projects where there's, you know, the customer selects a contractor, and then they discuss what's needed, you know, and I believe it was Mr. Esposito from the White Sox who testified that he believes walkways were discussed. So I don't think the fact that my client and the White Sox went back and forth impacts whether or not you look to the contractor for the duty, and a lot of that back and forth was caused by the engineers who had input into the project. So that's where some of the negotiating came from. I guess, and you can disagree with me, that Thompson is an exception to the general rule in Section 385. I mean, generally, there will be a duty, and there's not when your ability is so confined by a bid and says just do this immediately, exactly like we had it before. I think that's what we had in this case. My client was told, replace the roof. Take the old one off, put a new one on. The representative, Mr. Sampe, said, we wanted it replaced in kind. We wouldn't pay for anything extra. We didn't know what anything was. We just wanted a new membrane roof. Basically, he testified, get everything. I want them to get everything that they could. If they need it, know that I have the warranty. So I think that's why it falls within Thompson, and that's why the trial court, I believe, also fell that way. But it's – I believe it's clear that Bennett was aware that SECA offered these – Correct? Yes, Your Honor. So the argument here is whether or not Bennett advised the White Sox of that. And I'm asking, is that a question of fact that would defeat summary judgment? I don't believe so. I think because the testimony has shown that even if my client had offered every single option available to us under the sun from every manufacturer, it wouldn't have been accepted. The White Sox and the owner of the stadium were clear. They just wanted the same roof. Now, isn't there also conflicting testimony from your client as to whether or not your client was even aware? Mr. Egan – oh, I'm sorry, Mr. Ehart, he testified that he didn't recall, I think he said, if he was aware of the cross grip, which is the one that they suggest should have been done. So, of course, if he wasn't aware, then the White Sox is saying, well, he never told us about it. And if he never told the White Sox about it, then I'm asking, is there a question of fact there? I don't believe so because, I mean, the contract was, whether it was by bid, by negotiation, it was replace this roof exactly with what we have. There's no evidence that walkways would have been accepted. I know we discussed the fact that they were installed later. But at the time this contract was entered into and the work was requested, all the White Sox wanted was the same roof put on. And I believe that was an issue raised by the trial court was, in Justice McClure's case, we gave them what they wanted. They asked for this roof, we gave it to them. So even if all these other bells and whistles were offered, I think the evidence shows that they would not have been accepted or installed at this project. I'm sorry, go ahead. Was it Bennett's responsibility to give the product literature to the White Sox? I believe Mr., and you'll correct me if I'm wrong, it had testified he did give product literature to the White Sox. He did not give, obviously, the cross grip because he said he was not sure if he was aware of it. But he did give product literature, and I believe he even testified that he leaves it to the customer to decide what features they would like to add. And as you pointed out, this sign of tread is listed in every bid proposal. It's also listed in the purchase order from the White Sox.  But to get back to Justice Walker's point, is there a fact question about that? Did they give them the SICA products, literature, and warnings, and all of the things that went with that? I don't believe it's a question of the fact that it would defeat the motion. It goes to additional steps that could have been taken, that somehow maybe we could use against one of the parties that they could have done these steps. Just like they raised the fact that the walkways were installed later, it could be raised in that aspect. But I don't think it's a question of the fact that it defeats the motion because of the terms of the contract and all of the deal. The SICA sticker, little roof top access to emergencies, proceed with utmost caution, it's not undisputed that you gave that to the White Sox, is it? I believe the White Sox do dispute that was given. Yes, I think it's a question of fact as to whether that was given. That one particular warning, yes. It's this big sticker that SICA gives you as a contractor, correct? Correct, yes, that's what the evidence has shown. I think Mr. Niggins said it was not given. Let's come back to Justice Griffith's question again, though, because you answered it the same way twice. The first time you responded to his question, the second time you volunteered the information. You just said that you implied that it is a question of fact, but not a question of fact that you believe defeats the motion. Is that your answer? I probably chose the wrong phrase. It was about whether the additional material was given to the White Sox, correct, Your Honor? I think so. I mean, you said that, well, it's a question of fact maybe, but not a question of fact that defeats the motion. I just want to be clear on what your answer is, because you said it twice. Well, I did, Your Honor, and that was – So it is a question of fact, but not one you believe that defeats the motion, correct? It's a question in the case, but I don't believe it's a relevant issue to the issues before this Court, and that comes down to what duty Bennett had to the plaintiff, to the White Sox, and possibly to SICA. You know, it's just – it was a misstatement on my part. I don't believe it is an issue that is sufficient or relevant to the duty arguments that the trial courts ruled on. But part of the reason that I was asking it is you said a couple times, the Sox wouldn't have ordered it anyway, but we don't know that if they didn't have all the facts. And, of course, they had an engineer, but even your representative didn't necessarily know everything that was available. So why would the Sox know everything that was available? And it all just becomes a fact question, and if it was given to them – Mr. Ahead did testify. He gave them the information he had that he was aware of. The fact that he doesn't remember if he was aware of the cross script, you know, wasn't fully fleshed out because he said, I don't remember. So it's not like he said, no, I did not know about it absolutely. So one issue that the plaintiff did not respond to was the Cortada case, which involved the gentleman who had varnished stairways. The plaintiff later fell on that stairway and sued this individual because he did not install a handrail or non-skid walkways on the stairway. And I believe the facts in that case are very similar to this case. The federal court in that case found that there was no duty to add anything to the stairway, and they again looked at the contract. And they found that the defendant, the installer, the gentleman who varnished the staircase, was limited in his authority to do work authorized by the owner. And that's similar to this case. My client was limited in what he could do by the work authorized by the owner of the stadium. And then the court also looked to the contract to define what duty, and it found that the defendant had no duty to install any type of walkways on this staircase. So I believe that's similar to the present case. I believe the evidence in the record has shown my client complied with all terms of the contract. It fulfilled all duties to the parties in this matter, and it did all the work in a professional manner. And I believe summary judgment by the trial court was appropriate. Thank you. Thank you. Anything else you want to say about Bennett? About Bennett, just briefly. One of the very first things my friend said was that he believes that walkways were discussed. True, not slip-resistant walkways. There's not a shred of evidence in the record about that whatsoever. We've talked about that. Ehart should have known but did not know. There's no way he acquired knowledge about cross-brick and slip resistance. Newton says that every salesman is supposed to know, and Seekers says that it's expectation of its suppliers with whom it has relations like this, so we've certified the seller and everything, that they are bound to know everything that's there. And again, where in the record does it tell us when cross-brick became available? What should we look to, if you know? I can tell you my impression of things is that the cross-brick was always available, and it's just Ehart didn't know about it. That was the only thing. Other than that, I don't think there's any issue whatsoever with respect to the corridor. I think it's just there, and that's why I don't know, because it's always been around. Okay. Always? Not since the floods. Thanks for that. I think the course questions have fleshed it out. So, Seeker. Seeker. We've had two causes of action against Seeker, the first for negligence, the second for restricted liability and tort. The negligence liability arises under Section 388 of the Restated Second of Torts. The one who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel or be endangered by its probable use. And so that sets out the framework of negligence law when you're selling something like this. And Seeker has not argued that Section 388, this negligence liability, does not apply in the first instance, but only argues that it does not apply because it gives you the condition of the PVC when wet is open and obvious, and then that section goes on to say that you don't have a duty to warn about things which are open and obvious. And as we've discussed primarily with the White Sox here, there's a question of fact as to whether, first of all, this is open and obvious when you have small areas of water that's collected when it has not rained recently, and secondly, when you have an unusually slippery condition. There's a question as to whether the plumber should be charged with that mileage. And at a minimum, it's a question of fact as to whether this was open and obvious. The strict liability claim arises under Section 402A, and I'll discuss that second. These two theories are independent. They're applied separately when you have a certain negligence in one and strict liability in the other. With respect to the negligence claim, Sika argues that this was really a good roof, and PVC was only sold to be a roof. And it's true. It's a fine roof that, as far as I know, kept out the water, but that's not what we're talking about here. This particular roof was also a walking and working surface, and its faulties in that regard is what's at issue here. And Sika's sales material, and I knew that the Court has already made reference to this earlier, contain an illustration of a slipping and falling stick figure, showing that they certainly knew that these roofs can be walked upon. Its product data sheet for CrossGrip has dramatic omissions in it, which apply not only to Sika, but also to what Bennett knew or should have known. And Sika's product data sheet for CrossGrip says, quote, improved rooftop traction while preventing unnecessary accidents using CrossGrip walkway mat. Secondly, CrossGrip provides permanent slip resistance even in areas where pounding may occur. And it's almost as if it was written with respect to this case in mind. So the roof material was negligently dangerous when it was sold because it was not accompanied with sufficient instructions about walkways and warnings that CrossGrip should be installed in those areas where workers could be expected to be walking on the roof. Now, we do not contend that Sika had to directly warn each end purchaser of the product, nor do you know how each piece of roofing it sold was going to be used. The law goes, and we've cited the cases, that Sika can discharge that duty by sufficiently warning and instructing its intermediate vendees, as Bennett here. And there's no competent evidence in this record that Sika warned and informed Bennett of the dangers of the wet, slippery PVC, of the need for Bennett to warn his customers of that problem, of the need for Bennett to I said there's no evidence in the record? There is some evidence that Sika warned Bennett about Well, but isn't that, according to the law, that's all that's required of Sika? You just said that. I agree with you. Yes. That they're not required to have warned individual customers. Yes. They warned their suppliers. Right. I mean, Bennett was their main supplier, correct? And what I'm trying to develop here is that there's a question of fact, if they're adjourned to decide whether Sika did an adequate job of warning Bennett. You believe that's an issue in the case, to see whether they don't warn Bennett? I do, because there is no direct statement here that Sika told Bennett that you, in selling our product, which becomes your product, that you should install Is there an issue as to whether that sticker was provided? The court has already reviewed the uncertainty in the record. I think the shop says we don't involve getting it. I think Bennett says we did get it. And that that sticker You would say is not enough. Is not enough, exactly. And so then, as to the rest of it, there isn't enough here. And what's the not enough? What's the rest of it? What else should they have been told? Tell your customers that when our workmen who are going to be working on this, that they should sell and install CrossGrip. I can go on as a plaintiff's attorney for five more minutes. That's the hard part. But it's not just that it's slippery, but there are ways to fix it, and here they are. Right, and here's the product we sell. You should tell these people that it should be installed in order to make this safe. That's the essence of the case. But as you say, their product data sheet contains those dramatic admissions that you previously mentioned. Is there an issue whether the product data sheet was given to Bennett? I'm not aware. I can't assist the court in that. I simply don't know. Because that says improved traction, and then even when there's ponding water. As you pointed out, it looks like it was written right for it. Yes, and so it describes what it can do. But I would suggest, as we discussed just a minute ago, that it should have also been followed with the further statement, the direction from Seeker to Bennett saying that CrossGrip should be sold instead. And so this product data sheet describes what CrossGrip can do, but it doesn't go on to say that tell your customers that this should be used in that circumstance. But it's certainly a fair inference when Bennett reads it to sort of think, well, maybe they should have, but Seeker should have told him that. To the extent that Seeker grounds its nails in its argument on the open and obvious condition, I think I addressed that at the outset of my argument, and I won't take the court's time on that. With respect to the strict liability counsel, there is one additional issue there, unique to the strict liability claim, which was whether the roof, when installed, was a product. I think this was adequately briefed. I don't intend to take the court's time to talk about it. I would just mention this one thing, is that the case law is structured that you don't that the answer to this legal question is to be determined with respect to the purposes of the purpose of strict liability law as opposed to a dictionary definition of what's a product. Mr. Seeker. Can you say your name for the record? Yes. Daniel Cray, C-R-A-Y, on behalf of Seeker. Please support and counsel. I want to make sure that Your Honor has the right idea as to what Seeker is and is not in regard to this particular case. Seeker had its first contact with these parties when Bennett Brousseau, who was an elite roofing contractor who had years of contact with Seeker products, called Seeker and asked for a price. Seeker only sells to elite roofing contractors or roofing contractors. It does not sell to the general public. The only customers that Seeker has are roofing contractors who have demonstrated that they have an ability to provide Seeker roofs onto roofs properly. And so Bennett Brousseau, who knows who Seeker is, asked us for a price as to certain roofing membrane, Seeker roofing membrane. We provided that price to them. The next thing we heard from them is they had now been awarded the contract from the Chicago White Sox and they said, please supply us the product at the price that you gave us. And we did so. Seeker is not a designer of roofs. Seeker is not an architect. Seeker is not an engineer of roofs. Seeker, its representative, Eric Hurst, said in his deposition, we don't supply designs for roofs. What we do is we provide a watertight seal that adheres to the roof and becomes part of the roof. That is the design of our product. That's what it's made for. And it's not made for a working platform. If you want a working platform, there's a lot of things that you can put on our roofing membrane. You can put papers. You can put rock. You can put wood. You can put steel. And you can put the product which we sell, which Bennett Brousseau knows of, which is CrossBrip. CrossBrip is something that sits right on top of the product that we manufactured, the material that we manufactured, which then allows for whatever people have called it, a working platform or some type of walkway. That's what it's been referred to as. Also, in regard to what Bennett Brousseau or any of our elite contractors knew, of course, they've already used our products. Bennett Brousseau had used Sonitred, had certainly used our roofing membrane. We supply a website for them to come onto and get our product data. And that was testified to by Mr. Hurst, who is the SECA representative who gave a deposition in this particular case. Bennett Brousseau being a qualified contractor, certainly knew of our products. This is the website that's only open to contractors? Yes, it's open to contractors. But that's all. I couldn't go on it. You can go into certain parts of it, but the elite contractors and the contractors, roofing contractors, can go into other parts and get the data and whatnot that they need for their job. Because, again, it wouldn't be helpful to you to go on there because we can't sell it to you. We only sell it to our elite roofing contractors. So that's the background in which SECA enters into this particular case. And the first issue I'd like to address is, is SECA roof membrane a product? The cases that we cite, the Martins case, Martins v. MCL, the case of Chicago Heights Venture v. Dynamont Noble of America, and Walker v. Shell. The Walker v. Shell first was the matter where an individual fell off of a building during construction because a guardrail gave way, a guardrail that was part of the structure. The court said that is not because it was an indivisible part and component of the building, was not a product. The same in the Martins case where someone fell from a steel beam that he was standing on that had been attached to the building already. They said that's not a product. And lastly, in the case I think that resembles most of our facts here, the Chicago Heights Venture case, again, was a Northern District case, but it involved a PVC membrane that was attached to our roof. And they said it had now become a component of that structure, had become an indivisible part of that structure, and it's not a product. And I think also the policy considerations here are different when you talk about a building than if you go to the Walmart and you buy a bunch of trinkets or something like that that are used for something else. So as far as a product, I don't believe that it qualifies for a product. I don't believe there is strict liability. But even if there is, even if someone could say this qualifies for a product, I believe the failure to warn under a negligence theory or a failure to warn or a strict product liability are very similar. And I think the arguments I'm about ready to make on the duty to warn would take place even if they're strict liability or they're under negligence. Again, as far as a duty to warn, counsel talked about Section 388 of the Restatement Second of Torts. And I agree that that applies. The Venus v. O'Hara case is very instructive on that, which talks about what warning we would have to give if a warning is required. And that particular case talks about you would have to only give the warning to your vendee. There's no way we know who the white socks are a lot of times. We don't even know who those people are that we're pricing product out for. We don't know why they're using it. You can only imagine there's a lot of different shapes of the buildings in Chicago. And some of them have very steep roofs where you wouldn't have a walking platform on those at all, but you can certainly have a roofing membrane, because you want a watertight seal on a slanted roof, just like you may want one on a flat roof. And as to Section 388 and the failure to warn, one of the things that the plaintiff can't get around is the fact that when we are going to be warning Bennett and Berceau, there's a lot of different requirements as to whether or not there is even a duty for us to warn Bennett and Berceau. And one of them would be that there's no reason to believe that those who use the chattel it's supplying will realize it's a dangerous condition. Well, my God, Bennett and Berceau are elite contractors. If they don't know of our product, there's a real problem here. And if they don't know that the inherent characteristics of the roof membrane is that it's slippery. I've got two parts to it, though. One is the dangerousness of the product, and the other is what can be done to remediate it. Yeah, certainly. And you're right. They probably do know almost as much as you do about the product, but what about remediation? Well, the remediation, that's interesting, because in trying to plan it uses SICA's actual warnings and instructions against Bennett and Berceau, but then somehow say they come up short as to SICA. So they're not transmitted. Well, no, but clearly they were transmitted, because... Is it clearly? Is it undisputedly? Or are there issues of... Yes, because they're in our applicator's handbook, which is what you have to use to apply our roof membrane. And that's what Bennett and Berceau did and has done multiple times. So that's already an evidence that that's in our handbook, that particular statement that talks about the need for walkways if there's heavy foot traffic on a particular roof. And you have to understand, and there's no question of fact in regard to the warning. It is what it is. And here you have to understand that the warning has to be somewhat general that we give, because we don't know all the uses that someone might use of our roof. So the plaintiff says, oh, this is a really good warning that was given to Bennett and Berceau, and they didn't give it on to the Chicago White Sox. Well, if they say that under one circumstance, I'm going to use that, because it is a good warning. And it tells them exactly what the issue here was, that they say there's a heavy traffic pattern or using it as a work surface, and therefore you should have a walkway. But you don't need, just so you understand, you don't need our cross-grip. We allow you to use paper bricks and rocks and wood and whatever you might want to use on that, as long as you don't puncture our products so it's not watertight anymore, you know, that's just fine. So unless there's any other questions. Okay. Thank you. Three points. The first is in our required brief, pages 13 and 14, they include verbatim testimony from EHOP. The question was asked, if SICA had recommended the use of a walking surface which was slip-resistant, providing additional safety for workers, and I'm skipping here, would you have recommended to pass that information on to the White Sox? If they had recommended it, yes. Question. Is your understanding that they did not at that time in 2010 answer, I don't believe so. So the question is fact. So you say this question is a fact. But if EHOP doesn't read the handbook, is that SICA's fault? I mean, I understand it's a problem for Bennett, but is that a problem for SICA? Well, it becomes a question, what did the handbook say? And I don't think the handbook said, Bennett, that it should be telling its customers to apply. Secondly, a topic we were talking about before, Justice McNamara, you asked me whether Cross-Script existed. I spoke to Bobbitt saying it existed forever. In the SICA brief at two places, page 9, SICA quotes from its own employee's testimony in the trial court, and it said, Adam, before the time Bennett and Purcell proposed to install the roof, SICA manufactured two slip-resistant treated walkways, Sarnicritt and Cross-Script. Now, of course, we now know that Sarnicritt wasn't slip-resistant. But anyway, at page 9 and also at page 5 of the SICA brief, they also again cite to the record where they say that Cross-Script was being manufactured, and they just don't talk about the date for it. Lastly, the duty to warrant in strict liability and negligence is very much the same, and it is very much related, except the only reason we talk about it in two separate ways. You can't take the product. You can't take the non-product argument from 402A and graph that into 388, which merely talks about the selling of a chattel, which was at the time it was sold. So I thank the Court. Thank you, everybody. Did anybody, because we did this in the summer, did anybody not get to say something that they really feel is very important to say? Hearing no answer, I will say that we're at recess. You all did a great job, and you will hear from us shortly.